All right, thank you both. That was very helpful. Next, we have Riechmann v. Florida, Department of Corrections and the Attorney General of the State of Florida. Good morning. May it please the Court, my name is Janice Bergman. I represent Dieter Riechmann, who is the petitioner in the District Court and the appellant before this Court. Today my arguments are going to focus on my first claim, the ineffective assistance of counsel claim with respect to Mr. Riechmann's guilt phase. He was granted relief in the state courts with respect to penalty where the Florida Supreme Court found that Mr. Riechmann's trial counsel had been ineffective by failing to investigate and present the testimony of numerous witnesses in Germany. Mr. Riechmann was a German national charged here and had provided counsel with a list of the names of numerous witnesses to be investigated in Germany. In addition, counsel had a list of witnesses that the state had asked German police to investigate. All in all, it was dozens of names of potential witnesses for Mr. Riechmann's trial, none of whom counsel even bothered to call by telephone to ask questions of. But, of course, before we get to the ineffectiveness claim, because the AEDPA controls here, I'm going to first direct my arguments to whether or not deference is warranted under AEDPA. With respect to both prongs of the ineffective assistance of counsel claim, this Court should given that with respect to both prongs of the ineffectiveness claim, the state court's determination was based on an unreasonable determination of the facts in light of the evidence before the state court. Specifically, with respect to the deficient performance prong, the Florida Supreme Court's factual finding was based on a misunderstanding of the state court record. The Florida Supreme Court considered that the deficient performance prong was based entirely on the failure of counsel to investigate the names of the witnesses who were on the list of persons interviewed by German authorities. That list is attached, both lists, actually, both that list and a handwritten list received from Mr. Riechmann were attached to my found that counsel's performance was not deficient because he couldn't be found deficient for failing to investigate witnesses on a list not provided to him. However, the list was clearly provided to him. The state court record of the evidentiary hearing is clear that that list was actually in trial counsel's files. There were two lists of relevant witnesses here. Both of them actually were in trial counsel's files, and the state court record is clear that he failed to court's determination as to deficient performance. With respect to reviewing the merits of that prong de novo, the state doesn't dispute that counsel's failure to investigate any of these witnesses was deficient. I won't spend a lot of time on this argument, but as I said, it's clear that counsel had the name of numerous witnesses and failed to make any effort to investigate, contact any of them, and had no explanation for his failure. The state court found no tactical or strategic basis for counsel's failure to investigate, and unless the court has any questions, I'll move on to the prejudice prong. With respect to the prejudice prong, there's also no reference afforded here as well because, again, the Florida Supreme Court's decision was based on misconstruing the records. Its factual finding was that the evidence presented at the state court record was cumulative of that presented at trial, and that it concerned evidence that was already admitted at trial, only presented in a different manner. And then the state court, the Florida Supreme Court, gave an example that counsel had secured testimony from the state's witnesses regarding Mr. Reichman's love for the victim, Ms. Kishnick, and that the jury was also presented a videotape that showed their loving relationship. And here, I would, this Florida Supreme Court's decision in this regard is clearly, misconstrues the record. I've got a specific question. Yeah. Was there any evidence actually submitted in the trial that the victim wished to continue being a prostitute? There was evidence that the state presented, I'm sorry, I'm sorry, Your Honor, actually, I was thinking the flip side. There was evidence at the state evidentiary hearing, yes, the testimony of one of the witnesses that was presented for Mr. Reichman by post-conviction counsel, her name was Ulrika Karpyshek, and she testified at the evidentiary hearing that she knew for a fact that the victim had no desire to quit being a prostitute. And I appreciate, Your Honor, pointing this back because this is actually a critical deficiency in the Florida Supreme Court's finding that the evidence was cumulative, because the evidence of the evidentiary hearing went to three aspects of the relationship between Mr. Reichman and the victim. One was the loving nature, which the Florida Supreme Court focused on, but there were two other important things that the state needed to prove with respect to motive. And one of those was that Mr. Reichman lived off of the victim, but also it was critical, was the argument that she wanted to quit prostitution and that he had murdered her for this reason. And so there was absolutely no evidence presented at trial through cross-examination of the state witnesses or through the state witnesses themselves that she did not want to quit being a prostitute. But at the state evidentiary hearing, through the testimony of Ulrika Karpyshek, she testified that she knew for a fact that she did not want to quit. And so that's a critical difference between the state court trial record and the evidence that could have been presented at trial had defense counsel only investigated and spoken with these witnesses. And the same thing is true with respect to the differences in the record about the financial situation. Let me stop you right there, because so you're saying the jury should have heard that she wanted to keep being a prostitute. That's correct, Your Honor. I mean, the fact that she to be a prostitute, I was financially independent. So why, if his whole defense and major, his major defense was I was financially independent, right? Yes, that was. And we had a good relationship. Yes, Your Honor. So if he's financially independent, I thought he was saying it didn't matter whether she wanted to be a prostitute or not. But maybe I'm misunderstanding. I'm talking about his own testimony at trial. I thought he said, I'm financially independent and I didn't care whether she was a prostitute or not. Well, that's correct, Your Honor. But also, the next argument I was going to be making was that the evidence at trial also failed to rebut, other than Mr. Reichman's testimony, also failed to rebut the state's evidence that he was financially dependent on the victim. And so these additional witnesses that again, these witnesses at trial counsel failed to investigate also would have presented evidence to demonstrate that he was indeed a successful businessman, that he was financially independent. I understand he had some more evidence about his financial situation, but you were talking about this Ms. Karpochek saying she knew the victim wanted to be a prostitute as a key witness that shouldn't have been there. And I don't know why her testimony would have mattered. Well, because Your Honor... Because she says I'm financially independent and it didn't matter to me. But this was the key thrust of the state's case, Your Honor, was that he was financially dependent on her and that she wanted to quit prostitution. And honestly, through the cross-examination of the defendant, it was not entirely clear that, I mean, the evidence with respect to his financial independence from the victim would certainly not, was not as strong as it would have been had trial counsel investigated these witnesses and presented testimony to support his own... Help me with this, and you may be right, we need to review all of this de novo on the IAC claim. I think you're right on the deficient performance for sure that they messed that up, and I've got to look back at the prejudice part. But even de novo on IAC prejudice, to me, the overwhelming evidence of motive was the life insurance policies, okay? And that's often the case in these type of situations here. And to me, there was so much motive about these life insurance policies, not only in quantity, but in amount, in the rental car policy, and all of that, and his immediately making claims on the policies, that to me, all of this other stuff was noise. So help me why, under a prejudice analysis, on the motive issue, because all this other stuff was just on motive, right? Yes, Your Honor, all of it. Why was there not overwhelming evidence of motive, and all of this is just noise? Well, Your Honor, my perspective on this is, my husband has a million dollar life insurance policy on me, and no one would consider that to be a motive if there wasn't a reason for our relationship to have broken down, or there were financial reasons for him to want to claim that money with respect to insurance, you know, with respect, because he needed the money for some reason. And so I think the insurance policies alone do not provide a motive. The motive has to be combined with the deterioration. There were six policies here, right? Yes, Your Honor. Okay. And there were, one, the rental car was double indemnity that he did on his diner's club, right then and there. Yes, Your Honor, and I think that's true for most credit cards, but when were the last two policies he took out on her? Some policies she had had on herself for a long period of time, and she then transferred them to him. First of all, it was her estate was a beneficiary, but she transferred it to him. But I thought within the last year, he, or two years, he had taken out two more on her. He bought on her. Yes, Your Honor. How close were those to the murders, those last two? I don't honestly remember, Your Honor. I think they were within a year, but I'm not entirely sure. But Your Honor, she also had numerous policies with respect to him, and they had been in a relationship for 13 years. Again, I think the insurance policies don't provide a motive without also the additional evidence of a deterioration in their relationship and also a deterioration in his financial standing. And without the witness, there was nothing to that the state put on. There was nothing to rebut the evidence, the state's evidence that she wanted to quit prostitution, and there was very little to rebut the state's evidence that their relationship had deteriorated, that he was cruel to her, that he was disparaging of her. And through these numerous witnesses that counsel didn't even bother to place a telephone call to, they would have altered the focus. In the cumulative analysis, there were four witnesses at trial. They had the videotape of them the day before in a loving relationship. Yes, Your Honor. All right, and then there were four kind of friend witnesses, I think, or maybe I'm wrong. The four German witnesses were called by the state, Your Honor. Okay, but they testified they had a good relationship, or at least to some extent. The only person, the only two who focused on the actual relationship between Mr. Reichman and the victim were Dina Moeller, who had known the victim for three months and had never met Mr. Reichman, and then the victim's sister. And both of those said, both of those witnesses, well, Ms. Moeller testified that Ms. Kishnik loved Mr. Reichman and that Mr. Reichman didn't love her in the same way, with respect to the actual relationship. Who were the other two witnesses, German witnesses? The other two German witnesses was a man named Peter Meyer, and I'm going to pronounce his name wrong, Reinach, and he testified very briefly that Mr. Reichman had told him that Ms. Kishnik had wanted to quit prostitution. Okay, then the other one was Mr. Steiner. Mr. Steffan, who testified about the insurance policies, and so he did not testify. And so defense counsel only put up his client. Was he the only witness? That's correct, Your Honor. Well, there was also a ballistics expert, I'm sorry, a blood spatter expert, but there was no one who testified regarding the relationship, either the personal aspects of it, the financial aspects of it, or any testimony about whether or not the victim wanted to quit prostitution. I'm well over my time. If the panel has any additional questions, I'll wait for rebuttal. I actually do, and hopefully Judge Rosenbaum will let you keep some of your time. There have been some discussion about whether and to what extent all of this evidence would have been admissible. Yes, Your Honor, the state argued that this evidence wouldn't have been admissible because it was character evidence. I would argue, as I did in my reply brief, that this was not character evidence. This was impeachment evidence. It tended to prove or disprove Mr. Reichman's motive for murder. Motive is a material fact under Florida law, and you can present as impeachment under Florida law evidence that would demonstrate that Mr. Reichman's motive was not as testified to by the state's witnesses. And so here the state's theory of the case was that he murdered her because he no longer loved her. She wanted to quit being a prostitute, and he needed the money. And so all of these witnesses would have gone to those three very facts. I think it's more about whether they would have been hearsay, not a matter of relevancy, but whether the witnesses who hadn't seen him in years had any personal knowledge of his finances or their current relationship and her desire to do prostitution or not. I think that was more of the admissibility. Certainly it all could have come in in mitigation, in penalty phase. That's already been decided. How would it have come in to show motive when they hadn't seen them in years and had no personal knowledge Well, Your Honor, I mean... Most of them really didn't have any personal knowledge. Impeachment is very broad under Florida law. And beyond that, Your Honor... Who would they have impeached? Well, they would have impeached Ms. Moeller's testimony. I would point out with respect to limited knowledge, Ms. Moeller had only known the victim for three months out of the 13 years of their relationship, the last three months, and she had never met Mr. Reichman. She had spoken to him on the phone once. They were sharing an apartment together for purposes of the prostitution in the last three months before her death. Yes. She's got personal knowledge. Mr. Majorana had not seen them in three years and had only a limited relationship with Ms. Kishnick, and that evidence was admitted with respect to... But did you object to his testimony? Did the trial counsel object when he tried to testify? Your Honor, I don't remember if he objected on those specific grounds, but I do a multitude of objections throughout the course of the trial and may well have done that with respect to... He was constantly asking the witnesses for specificity with respect to timeframes and periods of time throughout the trial. I would also say that many of these witnesses had quite lengthy relationships with both Mr. Reichman and the victim. Ulrike Karpashnick, I think, had known them for 10 years. They had been social friends. Other people... I mean, there's so many witnesses. I don't know if there's any in particular that the court was concerned with, but many of these witnesses had quite extensive relationships with both Mr. Reichman, had conducted business transactions with him and various other... I'm fine. She's answered. Okay. Thank you, Your Honor. Sorry, there is one, or I'm wrong. I forgot. I do have one more. Can we consider the affidavit of Stefan for issues related to guilt, or is it at this point too limited to penalty, right? I mean, again, the state argued that the affidavits that were submitted were limited only to penalty. We can't go back on that now, correct? What's that, Your Honor? We can't go back on that now, correct? I disagree, Your Honor, because I think that the state courts considered those affidavits with respect to both guilt and penalty. Actually, if you look at the state 3850 petition, all of those affidavits were actually supporting the guilt phase in effectiveness claim. When they were presented at the penalty phase, Judge Gold expressly, at the evidentiary hearing before Judge Gold in state court, he expressly stated he was not being asked to, quote, determine whether or not this material should be admitted for purposes of penalty phase. He says, my understanding is that I am being asked to determine whether or not there was ineffective representation by counsel by not investigating these potential statements, and that these witnesses could have been available to put into evidence at trial. And that is in the state's appendix volume at page 9, at volume 2 at page 9. And so when Judge Gold, there were arguments at the evidentiary hearing about whether or not these would be put in solely for mitigation at penalty phase, and Judge Gold said he was admitting them with respect to trial counsel's investigation of these potential suspects. And he said, I'm sorry, he went on to say, I should permit them into evidence to show that these statements are persons that could have made such statements at the time of trial if counsel had sought them out. That's what Judge Gold admitted them for, and that's how he considered them. And he initially only recommended the grant of penalty phase relief, but these claims overlap. The allegations in the petition incorporated and relied on each other, and so I think that these statements were admitted with respect to both penalty phase and guilt phase at the state court level. Thank you, counsel. Thank you. And you've reserved your five minutes. Good morning. May it please the Court. Richard Polin, Assistant Attorney General for the State of Florida on behalf of the Applea, the Department of Corrections. Turning to the question of deference on the ineffective assistance claim and whether it should exist or be de novo. The reason why I believe that deference is appropriate over here is because when you're looking at deference, you're looking at the last state court to issue a written decision, and we're talking about deference to the Florida Supreme Court, which entails both what the Florida Supreme Court wrote and what was argued in the brief in the Florida Supreme Court. And when you take a brief of appellant in the Florida Supreme Court, as far as what was argued, for example, as opposed to this alleged misunderstanding about the list of the 37 witnesses from the German detectives or the handwritten list of a dozen names that Mr. Richman provided to defense counsel, it is the two concepts. And in the ineffective assistance of counsel claim, it keeps referring to the list of the 37 names, the 37 witness statements. And that's what the Florida Supreme Court was responding to. It was because Richman, in his capacity as appellant, was bringing this up and mixing and matching the two claims. It wasn't a misunderstanding on the part of the Florida Supreme Court. It was a direct response to what Richman was arguing. As far as the factual matter about focusing on the relationship, the loving relationship between the two, as opposed to zeroing in on the alleged financial independence of Mr. Richman such that he didn't need to live off of the victim's earnings, again, look at the Florida Supreme Court brief of appellant. Look at the statement of case and facts where some of this is referenced and then go to the argument portion that corresponds to it. And in all of that, you're just going to find one passing, very fleeting, nonspecific reference to anything of a financial nature. The manner in which Richman presented this claim in the Florida Supreme Court was focusing in its entirety on the loving relationship, and that's why the Florida Supreme Court is characterizing it as that. Yes, there is additional information in the 3.850 motion that was presented in the trial court, but the question is not deference to what occurred in the trial court. It's deference to what the the Florida Supreme Court. As the case works its way up from the trial court to the Florida Supreme Court, the issues get narrowed, the focus gets narrower, and it's not incumbent upon the justices of the Florida Supreme Court to go through every single sentence of every single page in the trial court pleadings, post-conviction pleadings, to determine what else is there that the defendant appellant has not presented that perhaps we should look at and entertain on our own and develop the claims on our own. So with that in mind, when you look at the questions of deference by looking not just at what the Florida Supreme Court wrote in its opinion, but what Richman argued in his brief in that court, the Florida State Supreme Court's decision is entitled to deference. Similarly, as far as viewing the evidence as cumulative, as a factual matter, and again, the focus there too in the Florida Supreme Court was on the loving relationship, not on the finances, and there was, while it was not extensive evidence in the Florida Supreme Court, it was evidence that was of a similar nature, especially from Dena Moeller, and while the appellant here has argued that well, Dena Moeller also said some negative things about Mr. Richman, when you look at these various witness statements that were relied on or the testimony that was provided from these witnesses at the evidentiary hearing, they weren't giving Mr. Richman a complete clean bill of health either. They interjected a significant amount of minimizing or some negative things as well. You're saying that the witnesses that Mr. Richman is putting forward also had negative statements? In some of the affidavits, some negative things had come out that it wasn't just a glowing, I mean, they all, the German witnesses all pretty much said they couldn't believe that he would have done this, and a substantial number of them talked about the loving relationship, but there were things that they qualified it that they didn't really know all that well, and they didn't know much about his finances. In referring to some of the financial matters, there were things that, well, on the one hand, they would say that he seemed to have financial interests and business interests, but then you read closer between the lines in these witness statements and affidavits, and you see things like, well, I heard this second hand, or I referred him to some Saudi business people, but then I never heard anything further of it, so what does it mean? It's more that there are reasons to question the thoroughness of their knowledge than it was that they actually said negative things, if I'm understanding you correctly. Yeah, I would say that that's a fair characterization of it. Turning to a couple more of the specific questions that came from the panel before, as far as your Honor's question about Ernst Steffen's statement, and again, a few things with respect to Mr. Steffen. First, this is the statement in question, the affidavit in question that was being referred to, my recollection of it, understanding of it, is that it was one that was obtained by defense counsel in preparation for the 3.850 hearing in the mid-1990s. It's not one of the original German witness statements that they were talking about at that point in time, but what happened at the evidentiary hearing is that on the first day of the evidentiary hearing, the defense presented about seven German witnesses as in-court witnesses whose testimony, to some extent, mirrored their witness statements, and they were all subjected to cross-examination by the state. On the third day of the evidentiary hearing, at the end of the hearing, volume three, between pages 205 and 225 of that volume, what happens is defense counsel tells the judge, now we'd like to introduce about another half dozen affidavits, witness statements, without presenting these German witnesses in court, so they weren't going to be subject to cross-examination by the state, and defense counsel explained the rationale for that. The rationale was that, judge, what we are going to hear from these witness statements, from the affidavits, it is materials that relate to potential mitigation at the penalty phase of the trial, and at a sentencing proceeding, at a penalty phase, there is greater leeway with respect to the admission of hearsay, and just as I would be able to introduce this kind of hearsay at a penalty phase of a trial, so too you should therefore be willing to entertain these affidavits without them appearing in court as witnesses and without them being subject to cross-examination, and that's the only basis upon which the state admitted those affidavits. If defense counsel had come out and said, and by the way, judge, I'm also interested in, and it was over the state's objection because of the inability to cross-examine, if defense counsel had come out and said, and judge, and above and beyond that, I want you to consider this with respect to guilt phase issues, with respect to Mr. Richman's state would obviously be screaming about the unfairness of that, not being able to cross-examine them, and the entire rationale of the admissibility being the leniency with respect to admitting hearsay at a sentencing proceeding does not apply with respect to something that would have significance with respect to guilt phase issues, so it is the half dozen affidavits that were all enumerated between pages 205 and 225 of the third day of the evidentiary hearing. All of those should only be considered with respect to anything affecting the penalty phase, not the guilt phase. To do anything further would be extremely unfair to the state under the circumstances where it was deprived the opportunity to cross-examine Mr. Stephan and the other handful of witnesses had it been presented in a forthright manner. There were also a couple of questions about the test. It would be helpful if you tell us why all of this testimony that came in the 3.850 hearing wasn't a lot more and not cumulative. The Florida Supreme Court says it's cumulative on the prejudice prong, and she says it's not cumulative at all. Powerful, different, overwhelming, and significant. I think you need to address that part of the prejudice prong because that's part of the basis. They say it was cumulative. What is this cumulative to? It's cumulative to the testimony about the loving relationship. But who testified to that? One witness, she says. It's pretty much the testimony of Dena Moeller. I don't think there's anything that's truly significant outside of her testimony. So why in all of this? It's much more than cumulative to that one witness. It's more people saying the same thing. I don't think it adds anything significant to it, especially when you consider the essentially minimal nature in which most of these witnesses were testifying. Did she say that she could never imagine him killing her? There were several of these witnesses made that. Does Dena Moeller say that? I don't believe that's part of her testimony, but that's never going to come into evidence at the trial. That's commenting on the believability and credibility of someone. That's sheer speculation. No judge is ever going to permit that opinion into evidence at trial that I cannot believe this. So you disagree that that comes in as motive evidence under an impeachment theory? Impeachment doesn't say that just because something is relevant to motive, anything goes. It still has to comport with the rules of evidence. And the appellant's argument, as I understood it, is that this was not coming in for character. It was coming in for impeachment. Well, that's a non-existent distinction because Florida's evidentiary code, which is very similar to the federal code, it has a section on impeachment and says that there are several means of impeaching a witness, and character is one of them. So they're equal. If it's not coming in as character evidence as a form of impeachment, what other legitimate authorized use of impeachment is it? It's not coming in as a prior inconsistent statement. It's, and as to most of these matters, it's things that these witnesses don't even have personal knowledge of. And I was going to zero in on one of the examples with respect to Ms. Karpyshek's testimony about whether the victim, Ms. Kishnik, wanted to continue engaging in prostitution. And when you look at the quotes, the excerpts from her affidavit that were quoted in the 3.850 motion, my recollection of that is that she refers to this as something that she learned from having spoken to quote-unquote friends. Who are these friends never identified, and regardless of who the friends were, how is this not a form of hearsay that's never going to get past the gate when the witness testifies in trial court and says that, and I knew she wanted to continue engaging in prostitution because I heard it from some of her friends. And how was the evidence that she did not want to continue in prostitution admitted? The evidence that she did not want to, I don't think there was any objection to it or quite well. Well, one piece of it, the witness, Ernst Steffen, he did testify as a trial witness, by the way. This was not someone totally new. So he testified at length in the trial, and he testified to that point, and his testimony came in because he said the defendant, Mr. Reishman, told it to him. So that's coming in as the hearsay exception for admission of party opponent. So that one was legitimately coming in. But anything else, whether it's someone saying that the victim told me or a friend told me, take your pick. Any of them are subject to valid objections that this is hearsay, an out-of-court statement, whether from the victim or from a friend of the victim or someone else for the truth of the matter, and it's not coming into evidence at the trial. So just to wrap all of this up, when you carefully look at all of these various witness statements and affidavits that they are talking about, and you only have excerpts quoted from them in the 3.850 motion of the affidavit statements in their entirety and not before the federal district court or this court. Were they admitted in the state court proceedings? Yes. Yes. So why are they not here? I can't say why. I just, I didn't handle the case in the district court and I had a struggle with that myself. They're not, you only have, the only access you have to them is primarily from the portions of them that are quoted in the 3.850 motion on the two respective claims. They're not here in their entirety. So, but when you, when you look at them, these are all... You're talking about just the affidavits or the statements? All of them, all of them. We have all of their testimony, the ones that they, who testified... You've got the, you've got the in-court testimony... Of every, of all those people. You've got the in-court testimony of every single witness who testified at the evidentiary... That's about eight, eight of them. For, you know, for... Seven or eight. Seven or eight German witnesses for... But you do not have the corresponding affidavits or statements that they provided either in 1987 or 1995 or 96 to the German law enforcement or to, or to defense counsel, those actual statements which were attached to the 3.850 motion and which were also introduced into evidence at the evidentiary hearing. They're not before either this court or the district court. So you just have various quotes and excerpts to go through coupled with corresponding testimony of those witnesses who did testify in court at the evidentiary hearing. But when you look at all of that information in any of those formats, all of this is really truly minimal when you consider the limitations on these witnesses who had, many of whom had not seen Mr. Reishman in five or ten years, most of whom, probably all of whom, did not have any real personal knowledge of his finances. Witnesses who were landladies who said, I got the check from him and said hello to him and didn't know anything truly personal about his background, the hair salon owner who's testifying about, he dressed well, therefore I thought he, I thought he was well-to-do. When you look at the totality of that package, whether you're talking about deferential standard, whether you're talking about de novo review, this is not the type of evidence that would sustain any burden on the defendant for demonstrating either the prejudice prong under Strickland for probably affecting the outcome of the proceeding or the corresponding materiality prejudice prong under Brady analysis which are largely the same. Thank you, counsel. I'm just going to start kind of where state opposing counsel left off with the discussion about these statements. I want to point out that one of the key witnesses at the state evidentiary hearing that I've been discussing, Ulrika Karpyshek, counsel for the state stated she only, she did not test, he made, he implied that she did not testify at the evidentiary hearing and the only thing before the court is a statement of hers. She was, however, a witness at the state evidentiary hearing. She testified that the victim did not want to quit prostitution and the state imposed no hearsay objection. And so that testimony is before this court. It was before the state court at the evidentiary hearing. Indeed, Judge Gold questioned, had the court reporter read it back just to be sure that that was actually what the witness had said. You said she learned that from friends. I don't know. I don't have a whole transcript here. She did not testify to that, Your Honor. It's not in her statement. I don't honestly know. No, she testified in person at the three point. Do you know whether or not she, it's okay if you don't know. She testified that she heard it from the victim, Your Honor. I mean, she was friends with the victim. They had known the victims for several years and she testified that she learned it from the victim. And I will say that this trial was quite unusual with respect to things, witnesses testifying with respect to things that the victim had told them. Normally, a court would consider that to be hearsay and not admissible, but at trial, the trial court judge broadly allowed witnesses to testify with respect to statements that the victim had told them. So do we have the complete transcript of her 3.850 testimony? That's correct, Your Honor. And do we have the affidavit if she gave one or let me say the original statement? Do we have the original statement? Was she one of the 37 that gave a statement? Well, there's, there, yeah, there's separate piles of affidavits and statements here. Okay. There were 37 witnesses who gave statements to the German police. Only nine of them were recovered by the time of the 3.850 hearing. In addition... And are they in the record? I'm not sure they're in the record before this court, Your Honor. Okay. And then... You don't even have that evidence then in the statements. Yes, Your Honor. Okay. And then, and then the... I'm sorry. Let's go to the affidavit. Yes, that's where I was going next, Your Honor. Okay, thank you. There were numerous affidavits that state post-conviction council obtained from German witnesses that they appended to their 3.850 motion. When the state provided the record to the district court, it did not include those attachments to the 3.850 motion. Do you have them? I may, Your Honor. I have 63 boxes of materials back in my office related to this case. So I'm happy to provide them to the court. No, I might ask for that. We'll confer about that. But, but you're saying the affidavits that were filed, we got to deal with whether they were really submitted for the penalty or rather Gold did them for the penalty of the guilt. I don't know the answer to that. You say it's both? Well, the answer, I mean, I think the court has the portion of the evidentiary hearing transcript where Judge Gold discussed the admission of those affidavits. And the court can review that. Okay, so let's go back. We've got the full testimony at the transcript. Of the 3.850, yes, Your Honor. We don't have any of the statements. There were only nine recovered at the 3.850, but none of them are in the record. And then we have the affidavits that were appended to the original 3.850 motion, and we don't know whether they're in the record or not. He says not. You don't for sure know. Yes, Your Honor. And are there any other, when we go to the bulk of what these witnesses have put before the post-conviction court, we're dealing with testimony, statements, and affidavits. That's correct, Your Honor. Okay. Yes. Thank you. That's helpful. And I will point out just that this case was prosecuted largely pro se in the district court. And I was brought in to assist with an evidentiary hearing that was where trial counsel was going to be the only witness, and then trial counseling unfortunately died before the evidentiary hearing, and the magistrate judge issued a ruling soon thereafter. So I apologize if the record is incomplete. I'm happy to supplement it if the court desires. We appreciate your help. You don't have to apologize. We appreciate your help with the case. We're just trying to see what we have or we don't have or whether it makes any difference for us. I want to make a couple other points. One, Judge Hull, with respect to motive where you're focused on the insurance policies, I can certainly understand that, but I did want to point out that that's not what the jury was focused on. When the jury deliberated, they sent a question to the court where they asked for the testimony, and the only testimony they requested was that of Dina Muller, who was the prostitute who worked with the victim. Are we talking about deliberation penalty? Guilt phase, Your Honor. Guilt phase deliberations. Okay. They asked for the testimony of Dina Muller. They asked for the testimony of the victim's sister, who had also testified with respect to the disparaging relationship, the way that the defendant supposedly mistreated her sister. And they asked for the videotape of the loving relationship, the videotape that was taken at Bayside Marketplace that supposedly depicted the loving relationship between the victim and Mr. Reichman. And I would say that, therefore, notwithstanding Your Honor's focus on the insurance policies, the jury's focus in this case was entirely on the relationship between the victim and the defendant, and the motive in this case being that the defendant no longer loved her, and that he killed her for financial gain. I mean, indeed, the last words out of the prosecutor's mouth in this case were basically along those lines. He said this case was about greed and about the end of a relationship. He argued in your brief that that video could be characterized as the construction of evidence from someone who knew that he was about to kill his partner. Did anyone actually make that argument at the trial, or are you simply suggesting that the jury may have inferred that, even absent a suggestion? Well, I mean, it was put on by the defense, Your Honor, and so I don't think the defense made that argument, and I don't want to misinterpret the record. I don't remember any reference by the state with respect to whether it went to their loving relationship or not. But certainly, the thrust of the state's argument was that for a decade, through these insurance policies, Mr. Reichman had been planning to eventually kill his victim for the money. And that was the thrust of their entire case. And so certainly, and they also argued that he had planned this thing all along, and so I would say that it's not outside the realm of argument that the jury would infer that this videotape could well have been just part of the plan to show that they were happy and frolicking in Miami and that this murder had not been committed by Mr. Reichman. I think you also mentioned that the trial judge took a rather broad view of the evidence in terms of allowing in a lot of evidence that may otherwise be considered hearsay. When we're looking at whether the evidence that you now cite would be admissible, do we offer our own interpretation of the hearsay rule, or do we try to look at what we imagine the trial judge would have said had he been presented with this evidence? Well, I think Your Honor has to look at it from the perspective of counsel at the time. That's how you view the Strickland standard. And I think with respect to how the perspective of trial counsel at the time was, you know, whether had he investigated these witnesses and presented them at trial, what would their evidence have been, and would it have changed the, you know, would there have been a reasonable probability that the outcome of the proceedings would have been different? And given the framework of a trial judge who was admitting what most courts would consider evidence with respect to statements made by the victim to witnesses, I think you would have to take that from the framework of had trial counsel called these witnesses and presented their testimony, the judge would have allowed testimony with respect to the statements that the victim had made to them, because he did that throughout the course of the trial over defense objection. I would also say with respect to the state's reliance on what was briefed before the Florida Supreme Court and whether that governs the scope of the court's review here, I would just point the court, this isn't cited in the briefs, but the Supreme Court case of Millerel v. Dretke in footnote two, the court stated that when considering 2254 D2 unreasonable in this, a federal court is free to consider, sorry, theories about the state court evidence that was never presented to the state courts. Thank you, counsel. Thank you.